959 F.2d 230
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Pedro M. GONZALEZ-SANCHEZ, Petitioner, Appellant,
v.
UNITED STATES OF AMERICA, Respondent, Appellee.
 No. 91-1561.
 United States Court of Appeals,
First Circuit.
 March 31, 1992
 
 Pedro M. Gonzalez-Sanchez on brief pro se.
 Daniel F. Lopez-Romo, United States Attorney, and Salixto Medina-Malave, Assistant United States Attorney, on brief for appellee.
 Before Selya, Circuit Judge, Campbell, Senior Circuit Judge, and Cyr, Circuit Judge.
 Per Curiam.
 
 
 1
 Petitioner has appealed from the dismissal of a § 2255 petition. We review the background.
 
 
 2
 * In 1985, petitioner, a lawyer, was convicted of one count of conspiracy to commit mail fraud and one substantive mail fraud count. His conviction was affirmed on appeal. United States v. Gonzalez-Sanchez, 825 F.2d 572 (1st Cir.), cert. denied, 484 U.S. 989 (1987). Thereafter, in an unpublished opinion, we upheld the dismissal of a § 2255 petition. Gonzalez Sanchez v. United States, No. 88-1368, slip op. (1st Cir. March 28, 1989). Petitioner now appeals from the dismissal, without an evidentiary hearing, of a subsequent § 2255 petition. Among other things, he challenges the government's failure to produce the original of a trial exhibit; he contends that the letter underlying the substantive mail fraud count was never introduced into evidence and, in any event, would not have constituted a mailing in furtherance of a fraudulent scheme; and he asserts that the government withheld exculpatory evidence, knowingly used perjured testimony, and altered documents. We turn to petitioner's various arguments.
 
 II
 
 3
 A. Government's failure to produce exhibit 79.
 
 
 4
 In conjunction with his present § 2255 petition, petitioner requested that the government furnish to him a copy of trial exhibit 79 with the exhibit label, which petitioner believed covered a crucial date, removed. Although the district court initially granted p etitioner's motion, the exhibit was not provided and the § 2255 petition was dismissed. Petitioner contends that this exhibit with its label removed would show his innocence and that the district court should have held the government in contempt for failing to produce it.
 
 
 5
 Some background is needed to place exhibit 79 in context. The mail fraud indictment arose out of the intentional burning of a wholesale business, R & S Sales, on October 7, 1981, by members of the Latorre gang and the submission of false claims to an insurance company. Wilfred Rivera Diaz, one of the government's chief witnesses and a leading member of the gang, testified that he purchased R & S Sales in the summer of 1981. In September 1981, the contemplated burning of R & S Sales in order to collect on the insurance policy was discussed at a meeting in Rivera's office attended by Jose Luis (El Cano) Latorre, the leader of the gang, Carlos Latorre, and defendant, among others. According to Rivera, petitioner, the gang's lawyer, advised at that time, somewhat facetiously, that, due to the way the organization was operating with agents on the payroll in the police and other places, they would need to get all of Puerto Rico. Petitioner's role in the R & S fire would be to handle the insurance claim. Thereafter, according to the trial testimony, most merchandise was removed from R & S Sales, and on October 7, 1981, Jose Luis Latorre and Carlos Latorre set fire to the building. In the process, Carlos was burned. According to the testimony of both Rivera and one Jose Manual Martinez Machuca (Machuca), the manager of R & S Sales, petitioner advised that Carlos not be taken to a hospital close to R & S, but rather to a more distant one, and that Carlos claims to have been burned on a boat Rivera and Jose Luis owned. That plan was followed.
 
 
 6
 After the fire, petitioner took charge of processing the insurance claim for the R & S fire. According to the testimony of Machuca as well as that of Jose Santiago Rodriquez, the former owner of R & S Sales and the owner of the building in which the business was housed, petitioner directed what was to be done, but arranged that the insurance claim actually be presented by a different attorney, who was not privy to the fraud, because petitioner was "burnt" with the insurance adjusters after having submitted the insurance claim on behalf of Caribbean International, another intentional fire.
 
 
 7
 In short, the testimony provided a firm basis for concluding that petitioner knew the R & S fire had been intentionally set in order to collect the insurance proceeds and that petitioner assisted in attempting to obtain the insurance proceeds.
 
 
 8
 Exhibit 79, the original of which petitioner contends is so necessary to prove his innocence, does not relate to the R & S Sales fire. Rather, it pertains to a different fire over a year earlier (June 30, 1980) at Farmacia Magnolia and the insurance claim submitted in conjunction with it. According to Rivera, the Magnolia insurance claim was handled by petitioner, and, as in R & S, involved false invoices so as to portray the business as having more inventory than it actually had. One such false invoice for Magnolia was supplied by Rivera himself. Indeed, Rivera claimed that he first met petitioner in 1980 when petitioner came to Rivera's warehouse in order to obtain an invoice from Rivera's business (Caribbean International) which would falsely state that Caribbean had sold goods to Farmacia Magnolia. In other words, according to Rivera, petitioner had prior experience in making false claims to insurance companies.
 
 
 9
 To rebut Rivera's testimony that petitioner had been involved in submitting false claims on behalf of Farmacia Magnolia, petitioner presented the testimony of Gilberto Latorre. Gilberto said that he and his wife had operated Farmacia Magnolia in 1980 until it was accidentally destroyed by fire on June 30, 1980. Petitioner had submitted the insurance claim on their behalf. Gilberto denied that he or his wife had ever done any business with Wilfred Rivera Diaz or Caribbean International, whether before or after the fire, and stated that no invoice from Caribbean International had been part of the insurance claim.
 
 
 10
 To impeach Gilberto's testimony that no invoice from Caribbean International had formed any part of the Magnolia fire insurance claim, the government presented exhibit 79. Gilberto identified exhibit 79 as a list of suppliers of merchandise to Farmacia Magnolia, along with the amount owed them, appearing on the letterhead of Tomas Quinones Pinero, CPA. Last on the list was Caribbean International, $5,615.55, the second highest amount among the fifty entries on the list. Gilberto said that he had not himself prepared exhibit 79, but rather had turned over a handwritten list of suppliers.
 
 
 11
 The genesis of exhibit 79 was further explained by the adjuster who had handled the Magnolia claim on behalf of the insurer. The adjuster testified that petitioner had supplied various evidence, including invoices, to support the Magnolia insurance claim. Among these invoices was government exhibit 80, an invoice from Caribbean International, Inc., addressed to Farmacia Magnolia and dated April 28, 1980. The adjuster had hired CPA Quinones to audit the information. Exhibit 79 was Quinones' report. In other words, a permissible inference would be that, based on the information the CPA had received from petitioner, the CPA listed Caribbean International as having supplied Farmacia Magnolia with $5,615.55 worth of merchandise.
 
 
 12
 The copy of exhibit 79 now available has the evidence marking sticker in the middle of the top of the page. The document does not show the date it was prepared. Petitioner suspects that said date may be underneath the sticker. For that reason, he requested the original with the sticker removed. As will be discussed subsequently, the government has been unable to locate the original. Hence, it is not now possible to confirm petitioner's suspicion. The important question, however, is how this date would be material to prove petitioner's innocence or to impeach other witnesses. In an earlier order, we directed petitioner to explain why the date the document was prepared is material. Petitioner has failed coherently to do so.
 
 
 13
 We gather that petitioner believes that Caribbean International was added to the list of suppliers on exhibit 79 at a later date than the earlier entries. This may be so, for a total appears after the first forty-three entries. Seven entries, including Caribbean International, then follow in a slightly larger type succeeded by a grand total. It may be, for example, that additional invoices were supplied at a later date requiring the list to be augmented. How whatever date which may-or may not-be located under the evidence sticker is material, petitioner has failed to explain. Rather, he has simply asserted, without adequate explanation, that the date of preparation would impeach government witnesses.
 
 
 14
 Exhibit 79, which at most imposes one layer of impeaching evidence upon another on a matter collateral to the acts for which petitioner was on trial, is tangential. We do not understand petitioner's argument and fail to see the materiality of the date. Consequently, we see no error in the district court's having adjudicated petitioner's § 2255 petition without taking further steps to locate the original of exhibit 79.[1]
 
 B
 
 15
 . Whether the district court erred in refusing to hold the government in contempt for failing to produce exhibit 79 and in dismissing the § 2255 petition before resolving why exhibit 79 had not been produced.
 
 
 16
 Even if we were to discern some relevance to whatever date may be under exhibit 79's evidence sticker, we would conclude that the district court did not err in denying petitioner's request to hold the government in contempt for failing to produce exhibit 79 and in adjudicating the § 2255 petition in the absence of exhibit 79. We recount some of the procedural background.
 
 
 17
 In March 1990, the district court granted petitioner's motion that exhibit 79 be produced with the exhibit label removed. A year later, the government had not yet responded, and the district court directed the government to show cause why it should not be held in contempt for failing to obey the March 1990 order. The government responded with copies of July 1990 letters from the FBI office in San Juan stating that the files had been searched, but that no evidence concerning the arson cases of Caribbean International Sales and R & S Sales, Inc. had been found. The FBI letters concluded that, pursuant to FBI guidelines, the evidence had either been destroyed or returned to its owner. The government also stated it had asked Insurance Adjusters and Appraisers, Inc. (the company which had hired the CPA who prepared exhibit 79) for exhibit 79, but that that company had concluded the file had been eliminated in accordance with their practice to destroy files five years after a case was closed. A letter in Spanish from the company was enclosed. The district court concluded the government had adequately searched for exhibit 79 without success and refused to hold the government in contempt.
 
 
 18
 We review the denial of a motion to hold a party in contempt for abuse of discretion. Langton v. Johnston, 928 F.2d 1206, 1220 (1st Cir. 1991). There is no abuse of discretion here. The government explained its delay in responding to the court's order (failure to receive the order) and demonstrated that a reasonable effort had been made to locate the original of exhibit 79. The government is not obligated to retain the original of exhibits, belonging to other persons, indefinitely and after trial and appellate proceedings have been completed. Cf. Arizona v. Youngblood, 488 U.S. 51 (1988) (failure to preserve potentially exculpatory evidence does not constitute denial of due process absent bad faith). Nor was an evidentiary hearing on petitioner's motion to hold the government in contempt required, for petitioner did not indicate he had any material evidence to present.[2]
 
 
 19
 C. Government's failure to prove count 2 of the indictment.
 
 
 20
 Count 2 charged petitioner with having aided and abetted mail fraud in that "[o]n or about October 21, 1981," he "cause[d] to be placed [in the mail] an envelope containing a letter concerning an insurance claim filed by defendant Jose "Tony" Santiago-Rodriguez, d/b/a R & S Sales Corporation, addressed to Jose A. Santiago.... " This court's opinion affirming petitioner's conviction rejected petitioner's argument that there was insufficient evidence that the letter underlying count 2 had been delivered by mail (as opposed to messenger) and concluded that the evidence was sufficient to support petitioner's conviction. United States v. Gonzalez-Sanchez, 825 F.2d 572, 587-88 (1st Cir. 1987). Petitioner's § 2255 petition presented a variation on the theme. He now contends that the government did not prove count 2 because the letter introduced into evidence was dated October 14, 1981, rather than October 21, 1981 as charged in the indictment.
 
 
 21
 The evidence indicates that two letters from the insurance adjuster to Jose Santiago-Rodriguez were introduced into evidence. The first (government exhibit 19) dated October 14, 1981, asked Santiago (the owner of the building which housed R & S Sales) to appear for a deposition and bring all evidence relating to the insurance claim. Vol. IV, September 12, 1985, p. 19. The second (government exhibit 20), dated (according to the testimony; we do not have the original) October 23, 1981, set a new date for the deposition as Santiago had failed to show up on October 19, 1981, the date the deposition had originally been scheduled. Vol. IV, September 12, 1985, pp. 17-18. Because neither of these letters (according to the testimony) are dated October 21, 1981 as charged in the indictment, petitioner contends the government did not prove its case.
 
 
 22
 Although the adjuster referenced exhibit 20 as a letter dated October 23, 1982, petitioner's counsel referred to it in his arguments as being dated October 21, 1981, the same date charged in the indictment. Vol. IV, September 12, 1985, p. 109; Vol. VII, September 20, 1985, p. 62. As we do not have the exhibits, we do not know what the actual date of exhibit 20 is. It may be that the adjuster misspoke and that exhibit 20 is actually dated October 21, 1981,[3] or it may be that there is a slight variation between the proof and the indictment. Even if the latter, petitioner is not entitled to relief. Petitioner did not object at trial to whatever minor variation may have existed, his counsel does not appear to have been under any misapprehension, but instead argued vigorously (albeit unsuccessfully) that the government had failed to prove that the adjuster's letters to Jose Santiago had actually been delivered by mail, and petitioner suffered no prejudice from the minor variance. In these circumstances, petitioner is not entitled to relief. See United States v. Morris, 700 F.2d 427, 429 (1st Cir. 1983) (variance between dates charged in indictment, set forth in bill of particulars, and proven at trial did not deny defendant due process; "[w]here a particular date is not a substantive element of the crime charged, strict chronological specificity or accuracy is not required"), cert. denied, 461 U.S. 947 (1983); Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").
 
 
 23
 Petitioner also argues that the letter from the insurance adjuster to Santiago did not further the charged mail fraud scheme, and, therefore, can not properly serve as a predicate for the substantive mail fraud count. Unlike the mailings involved in the cases on which petitioner relies, e.g., United States v. Maze, 414 U.S. 395 (1974); Kann v. United States, 323 U.S. 88 (1944); Parr v. United States, 363 U.S. 370 (1960), which were sent after the fraudulent scheme had reached fruition and did not advance the scheme in any material respect, the October letters here were part of the adjuster's information gathering process, a process the adjuster followed before an insurance claim would be paid. The letter in the present case from the adjuster rescheduling Santiago's deposition is similar to the second mailing in United States v. Pacheco-Ortiz, 889 F.2d 301, 305 (1st Cir. 1989), which we upheld as supporting a mail fraud count. In Pacheco-Ortiz, an insurance mail fraud scheme involving the intentional burning of a warehouse, we concluded that a letter from the insurance adjuster to the owner of the warehouse requesting more documentation so that settlement could proceed was "unquestionably ... in furtherance of the illegal scheme.... [T]he letters ... by seeking documents needed for the settlement to proceed, clearly furthered the efforts of the cultivators of the scheme to taste the fruits of their labors." Id. at 305, 306. Much the same is true here. The adjuster needed to question Santiago before determining whether the claim would be paid, and, hence, the letter to Santiago was a step in furthering the process through which petitioner and his co-conspirators hoped to obtain the insurance proceeds. That the mailing in the present case may have occurred at an earlier stage in the claims process does not make a material difference. See also United States v. McClelland, 868 F.2d 704, 707-08 (5th Cir. 1989) (letter from field adjuster requesting documentation furthered defendant's scheme to obtain payment on insurance claim).
 
 D.
 
 24
 Government's failure to disclose exculpatory evidence, knowing use of perjury, and alteration of documents.
 
 
 25
 Petitioner contends that through materials he has obtained as the result of FOIA requests, he has discovered that the government withheld exculpatory evidence, knowingly used perjured evidence to convict him, and altered documents. His § 2255 petition, supporting brief, and 32 exhibit appendix asserted numerous examples of the government's alleged wrongdoing.
 
 
 26
 The government's answer did not specifically admit or deny any of the allegations, but rather argued generally that they were conclusory or had been adjudicated adversely to petitioner in his earlier § 2255 petition. The magistrate agreed with the government and recommended dismissal without an evidentiary hearing. The district court adopted the magistrate's report.
 
 
 27
 Petitioner presented a similar claim of governmental wrongdoing in an earlier § 2255 petition. We upheld the dismissal of that petition without a hearing on the ground that petitioner's allegations were too conclusory and unsubstantiated. We pointed out several deficiencies. For example, petitioner had not explained why various evidence was not offered at trial and had failed to produce an affidavit from his trial counsel attesting that particular evidence was unknown at the time of trial. Gonzalez-Sanchez v. United States, No. 88-1368, slip op. 6-8 (1st Cir. March 21, 1989).
 
 
 28
 This time petitioner did file numerous exhibits in support of his § 2255 petition. As we will discuss more in connection with petitioner's various claims, many of the allegations still remain generalized and conclusory, however, and petitioner has continued to fail to make clear whether the substance of the allegedly withheld information was actually unknown to petitioner and his counsel at the time of trial. In view of the fact that petitioner is a lawyer, that this is not petitioner's first § 2255 petition, and the unlikelihood that much of the allegedly withheld evidence was unknown to petitioner, we think greater specificity was required. See Smith v. United States, 618 F.2d 507, 510 (8th Cir. 1980) ("mere statement of unsupported conclusions will not suffice to command a hearing"). With these general comments as background, we proceed to plaintiff's claims.
 
 
 29
 We start by stating the standard which applies in assessing whether the government's use of perjured evidence or withholding of exculpatory evidence requires relief:
 
 
 30
 ' A conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' ... [T]he fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt....
 
 
 31
 In cases of prosecutional failure to disclose evidence favorable to the accused ... [t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.
 
 
 32
 United States v. Bagley, 473 U.S. 667, 678-82 (1985); Myatt v. United States, 875 F.2d 8, 12 (1st Cir. 1989). We now turn to the specific allegations.
 
 
 33
 1. The debriefing of Carlos Latorre.
 
 
 34
 Petitioner stated that sometime after incarceration, Carlos Latorre told petitioner that, during debriefing in Saint Croix, Virgin Islands, Carlos had informed government representatives that petitioner had not been involved in any criminal activity including the arson for profit of Caribbean International and R & S Sales. In support, petitioner submitted a sworn statement signed by Carlos Latorre in which Carlos indicated he told the government petitioner was not involved.
 
 
 35
 Carlos Latorre was one of the co-defendants tried and convicted with petitioner. Petitioner does not state that Carlos's information-that is, Carlos's general denial that petitioner was involved in wrongdoing-was unknown to petitioner and his counsel at the time of trial. Nor does he suggest how he could have utilized it at trial. Carlos did not testify at trial, and petitioner does not suggest how he fruitfully could have obtained favorable testimony from him. In these circumstances, petitioner has failed to show that the debriefing information was material.
 
 
 36
 2. FBI reports of interviews with Dr. Freddy Docudrey.
 
 
 37
 Petitioner denies that he visited Carlos, badly burned, while Carlos was at Jose Luis's home on the night of the R & S fire and claims that the testimony of Rivera and Machuca placing petitioner at Jose Luis's home was perjured. Petitioner asserts, without any substantiation, that the FBI interviewed Dr. Docudrey, who denied seeing petitioner at Jose Luis's home. This claim appears identical to the one we dealt with in Gonzalez-Sanchez v. United States, No. 88-1368, slip op. 6-7 (1st Cir. March 21, 1989). We adhere to our ruling there. In addition, we note that petitioner's own witness, Gilberto Latorre, testified at trial that Dr. Frederico Docudrey ("Duboney" in the transcript) had treated Carlos at Jose Luis's house on the night of the fire. Vol. VIII, September 24, 1985, pp. 140-141. Hence, the doctor was not an unknown witness. If petitioner felt his testimony would have been helpful, petitioner's counsel could have attempted to interview him or call him as a witness.
 
 
 38
 3. Criminal Acts and perjury of Wilfred Rivera Diaz
 
 
 39
 Petitioner contends that the government withheld evidence of criminal acts committed by Rivera. In support, petitioner presents five index cards which, according to petitioner's translation, accuse Rivera in the period from 1971 to 1980 of possession of illegal goods, assault and battery, "ordinance," and disturbing the peace.
 
 
 40
 Rivera testified extensively to his life of crime. Among other things, he admitted dealing in stolen merchandise, involvement in over twenty-five van thefts during which persons were threatened with guns and sometimes kidnapped, participating in the arson for profit of Caribbean International and R & S, maintaining El Combate warehouse as a front for theft, bribing police officers, lying to FBI agents and the grand jury, illegal possession of firearms, and destruction of evidence. He acknowledged that he had faced up to three hundred years in jail for his crimes before deciding to cooperate with the government. The five accusations to which petitioner points are trivial in comparison to Rivera's admissions and would not have made a difference in the outcome of the trial. United States v. Page, 808 F.2d 723, 730 (10th Cir.) (evidence of an additional arrest for assault with a dangerous weapon of a witness whose seven felony convictions had been presented to the jury would not have made a difference), cert. denied, 482 U.S. 918 (1987).
 
 
 41
 Petitioner contends that Rivera also illegally distributed and sold firecrackers, stripped a car and then falsely claimed it had been stolen in order to collect the insurance, was involved in the kidnapping of a number's racket banker to extort payment, and burned his father's business after stealing the inventory. Petitioner presents nothing but his unsworn say so that Rivera committed these acts or that the government knew of them. In any event, the first two pale in comparison to the host of crimes Rivera did admit to and would not have affected the outcome of the trial. As for the kidnapping, petitioner does not state what Rivera's "involvement" was. Rivera admitted to having been an active member of a criminal organization whose modus operandi included kidnapping. In these circumstances, we see no reasonable probability that disclosing this information to the jury would have made a difference. As for the burning of his father's business, Rivera was not directly asked about that, but he did admit to burning his own business and to burning down his brother-in-law's (Santiago's) building over Santiago's objection, resulting in Rivera's sister losing her job at R & S. Clearly enough, family relationships were no barrier to arson for profit schemes. In these circumstances, one arson more or less in Rivera's life of crime would not have affected the outcome.
 
 
 42
 Last in petitioner's list of allegedly withheld information concerning Rivera's criminal past is the following:
 
 
 43
 Government representatives withheld information of Wilfredo Rivera Diaz's use and involvement in the drug business. On July 22, 1984, F.B.I. agent Primitivo Ros occupied a list of drug sales debtors from a Chrysler Aries K auto in Bayamon, with Rivera's name on it as one of the distributors of cocaine.
 
 
 44
 Drug dealing was one crime which did not appear among Rivera's admissions. Nevertheless, petitioner does not suggest how he could have used this list of dubious, unproven reliability or the information embodied in it at trial to impeach Rivera. It would not have been admissible under Fed. R. Evid. 609 (impeachment by evidence of conviction of crime). Petitioner does not suggest that the government ever had sufficient evidence to arrest Rivera for any drug crime (the hearsay list does not supply probable cause), and, hence, the list would not have been usable to suggest that Rivera's testimony was motivated by a desire to escape punishment for drug dealing. Nor would the list likely have provided a basis for asking Rivera on cross-examination whether he had ever been involved in drug dealing. This is because acts of misconduct which have not culminated in conviction may not be inquired into on cross-examination for the purpose of attacking the witness's credibility if they are not "probative of truthfulness or untruthfulness." Fed. R. Evid. 608(b). See United States v. Fortes, 619 F.2d 108, 118 (1st Cir. 1980) (upholding district court's determination that cocaine selling was not probative of untruthfulness); United States v. McDonald, 905 F.2d 871, 875 (5th Cir.) (drug use is not probative of truthfulness), cert. denied, 111 S.Ct. 566 (1990); United States v. Williams, 822 F.2d 512, 517 (5th Cir. 1987) (selling drugs not probative of truthfulness); United States v. Bentley, 706 F.2d 1498, 1509-10 (8th Cir.) (no abuse of discretion in excluding inquiry into prior drug indictment), cert. denied, 464 U.S. 830 (1983), 467 U.S. 1209 (1984).
 
 
 45
 Petitioner also lists instances where, he claims, the government knowingly permitted Rivera to perjure himself. He says Rivera perjured himself when he testified that Peat Marwick were the accountants for Rivera's business, Caribbean International. In support, he cites to a letter dated September 12, 1980, from a different accountant, stating that Caribbean International's accounting records had been consumed by fire. That Rivera had a different accountant in September 1980 handling the fire claim does not indicate that Rivera lied about the identity of the accountant when the business was extant. In any event, the identity of Caribbean International's accountants-information Rivera gratuitously offered in an ultimately unsuccessful effort to avoid answering whether he had accurately declared his income to tax authorities-was irrelevant. Hence, whether the testimony was true or false would make no difference to the trial's outcome.
 
 
 46
 Second, petitioner contends Rivera perjured himself when he testified concerning the arson of Eleven International. Petitioner claims that Rivera denied involvement in that arson. Petitioner's reading of the testimony is overly technical. When asked whether he had been "involved in the torching of Eleven International" (emphasis added), Rivera denied "involvement in that fire." When asked later on redirect by the government about Eleven International, he denied involvement in the fire, but implicated other people. Petitioner then quotes language from a later trial where Rivera acknowledged participating after the fire, apparently in the insurance fraud side of things. At most, the transcript excerpts show that Rivera, when asked about his own involvement in the fire, chose to strictly interpret "involvement in fire or arson" as pertaining to setting the blaze as opposed to doing the subsequent paperwork necessary to consummate the insurance fraud, but may have been willing to construe the phrase more generously when it came to implicating other persons. Petitioner does not point to any place where Rivera was specifically asked, and then denied, assisting in insurance fraud. Perjury is not established.
 
 
 47
 Third, petitioner says Rivera perjured himself when testifying that Rivera gave petitioner a $4,000 check, drawn on El Combate Wholesale's checking account at Banco Central, for petitioner's role in the R & S fraud. This matter was thoroughly probed at trial. On the one hand, Tony Santiago (the owner of the building housing R & S) testified that he gave Rivera $2,000 to pay petitioner when Rivera informed Tony that petitioner was seeking a $4,000 ($2,000 from Santiago; $2,000 from Rivera) advance payment. To make sure that Rivera had in fact forwarded the payment to petitioner, Santiago testified he asked petitioner about it and petitioner acknowledged receipt. Vol. I, August 28, 1985, pp. 93-94. On the other hand, Banco Central's records concerning El Combate Wholesale were subpoenaed, and a bank employee testified that there was no record of any check to petitioner during the relevant time frame. Vol. VIII, September 25, 1985, p. 8. He also indicated, however, that small portions of the microfilm were obliterated. It was for the jury to assess the conflicts and determine whether Rivera was telling the truth.
 
 4. Marcos Walter Rosales Zaidman
 
 48
 As with Rivera, petitioner contends the government withheld evidence which could have been used to impeach Marcos Walter Rosales Zaidman and knowingly allowed him to commit perjury.
 
 
 49
 Rosales testified that in September 1981, he had attended a meeting, held at El Combate Wholesale, where the burning of R & S in order to collect the insurance proceeds was discussed. Petitioner was not at that meeting. Rosales identified petitioner as the organization's lawyer, and said that petitioner initially was to handle the R & S insurance claim, but that the organization later took the case away and gave it to a different lawyer. Rosales stated he had first met petitioner when Rosales had been arrested for a van theft. The organization had sent petitioner to represent him and had paid for petitioner's services. Petitioner had thereafter served as the lawyer in an insurance fraud case. Rosales apparently had hit a wall, but the case was presented as if Rosales had collided with Jose Luis's van. Petitioner represented Jose Luis. Rosales indicated that he was currently incarcerated for five van thefts and had received immunity from prosecution for other offenses, including twenty-five to thirty van thefts, various robberies, illegal possession of weapons, and an attempted murder of a police supervisor he had participated in as a member of the Latorre organization, in exchange for his testimony.
 
 
 50
 Petitioner asserts that in addition to the crimes Rosales acknowledged, Rosales had also participated in the arson for profit of Rosales's home, had broken into a furniture store, and had stolen thousands of dollars in electronic equipment. He asserts that the government withheld this information (but without any substantiation either that Rosales had committed the listed acts or that the government knew of them). In view of all that Rosales did admit to, we conclude that these additional crimes would not have made a difference or affected the outcome. United States v. Page, 808 F.2d at 730.
 
 
 51
 Petitioner contends that the government knowingly permitted Rosales to commit perjury in several instances. He says that Rosales claimed that petitioner had represented Rosales in an insurance case when in fact Rosales's lawyer had been Marcos Perez, Esquire. Rosales' testimony, however, was that petitioner had represented Jose Luis in that case. Vol. IV, September 13, 1985, p. 86. Next, petitioner claims that Rosales committed perjury in a different case when he testified before the grand jury that Carlos Latorre had been involved in van thefts on February 2, 1981 and February 18, 1981. In truth, Carlos was out of the country at that time, petitioner claims, and the government withheld information concerning the grand jury perjury. In support, petitioner presents a document in which the government takes the position that Carlos was absent from Puerto Rico from December 1980 through February 1981 and did not participate in the February 2 and February 18 offenses. Petitioner presents nothing, however, to substantiate what Rosales's testimony before the grand jury was and does not state whether he was unaware of that grand jury testimony (whatever it was) at the time of trial. In these circumstances, we think petitioner's allegation of perjury is entirely conclusory.
 
 5. Jose M. Martinez Machuca
 
 52
 Machuca was the manager of R & S Sales and he provided damaging testimony against petitioner. Petitioner contends that the government withheld valuable impeachment information concerning Machuca's (1) participation in the arson of Eleven International, (2) accusation of embezzlement while working for Bono Rack Jobbers, and (3) issuing bad checks to Boyle Midway on R & S's account. Petitioner was aware of the first and third at the time of trial, for Machuca testified concerning them. He said that he had pled guilty to conspiracy to burn Eleven International, vol. VI, September 17, 1985, p. 70, and he recounted his participation in meeting with corrupted police officers to cover up or sidetrack the investigation of that fire. Vol. VI, September 17, 1985, p. 85. As for the bad check, Machuca stated he had appeared in court in 1982 in response to Boyle Midway's complaint for collection of money stemming from a check issued by R & S without sufficient funds. Vol. VI, September 18, 1985, p. 53. At the latest, then, petitioner was aware of this information at trial. He did not then object that it was new evidence which should have been disclosed to him earlier. In these circumstances, we find no merit in petitioner's claim of withholding impeachment information with respect to incidents one and three.[4]
 
 
 53
 We turn to the second incident-an alleged accusation of embezzlement while working for Bono Rack Jobbers. Had petitioner a good faith basis for believing Machuca had embezzled, then, under Fed. R. Evid. 608(b), petitioner might have been permitted on cross-examination to question Machuca on the matter. See 3 J. Weinstein & M. Berger, Weinstein's Evidence p 608 at 608-45 (1991) (listing embezzlement as one of the acts which may, in the district court's discretion, be admitted under Rule 608(b)). Petitioner gives no hint, however, of having any evidence which would show that Machuca was in fact accused of embezzlement or that such an accusation, if made, had any substance. (On the other hand, the government has not admitted or denied whether Machuca was accused of embezzlement or addressed itself in any manner to the allegation.) In short, petitioner's assertion is entirely conclusory. In any event, Machuca admitted to having participated in crimes with the Latorre gang, including the arson of Eleven International, and selling stolen goods. He acknowledged having been indicted on ten or eleven counts with respect to the R & S fraud and testified at length about his role in preparing false claims. One embezzlement more or less would have simply been cumulative of his already adequately documented misdeeds. In these circumstances, we conclude that there is no reasonable probability that the outcome would have been different had the evidence (if it existed) been disclosed.
 
 6. Jose "Tony" Santiago Rodriguez
 
 54
 Jose "Tony" Santiago Rodriguez owned the building out of which R & S Sales was operated and had formerly been an owner of R & S Sales. Santiago knew the building had been intentionally burned. He participated in the insurance fraud side of things and provided damaging testimony against petitioner.
 
 
 55
 Petitioner contends that the government withheld evidence that Santiago used a different lawyer in one segment of the fraud than the one Santiago testified petitioner introduced Santiago to. Petitioner cites no transcript reference, so we are not positive of what testimony he is attacking. In any event, the multiple facets of the scheme used several lawyers (some of whom knew of the fraud and some of whom did not). We do not see the materiality of whether Santiago at some point did or did not use a lawyer to whom he was allegedly introduced by petitioner. Petitioner's complaint that the withheld evidence precluded him from showing that Santiago lied and deceived attorneys is unavailing. There was abundant evidence that the conspirators' modus operandi was to deceive whomever necessary, including lawyers.
 
 7. Jose Enrique Otero
 
 56
 Jose Enrique Otero, a lawyer, was vice-president in charge of litigation at PRAICO, the company which had insured R & S. He testified that Carlos Bautiz, a private investigator working for Otero, had obtained a sworn notarized statement from Carlos Latorre in which Carlos admitted involvement in arson, including R & S. Upon further investigation, Otero learned from Carlos and the notary that Carlos had not in fact signed the statement. When questioned who was behind the forged statement, Carlos told Otero he thought it was petitioner because the fire case had been taken away from petitioner. Petitioner's counsel did not object to this testimony or to the admission of the falsely prepared statement. Petitioner's complaint now that the evidence is false is unavailing. The government itself elicited testimony that Carlos claimed not to have executed the statement, that the signature thereon did not match Carlos's, and that the person who notarized the statement did not recognize Carlos. The government did not withhold evidence that the statement was forged, but rather affirmatively demonstrated the forgery.
 
 
 57
 As for petitioner's attack on Otero's statement that Carlos said he (Carlos) felt petitioner was behind the forgery, petitioner's challenge comes too late in view of the failure at trial either to object or request a limiting instruction.
 
 8. Alteration of exhibits
 
 58
 Petitioner contends that the government altered exhibits 15 and 16. Exhibits 15 and 16, according to Rivera's trial testimony and FBI Agent Miller's voir dire testimony, are ledger sheets of the illegal transactions of the Latorre organization Rivera kept in his safe. Vol. II, August 30, 1985, pp. 413-14; Vol. II, September 4, 1985, p. 579. The exhibit which petitioner says was altered, a copy of which petitioner put in his appendix, is a three-page hand-scribbled list of twenty-eight items dated December 2, 1983. Rather than being government's exhibits 15 and 16, it appears to be defendants' exhibit E. We gather, then, that plaintiff's claim is that the government altered exhibit E.
 
 
 59
 Exhibit E, according to Rivera's testimony, is a list of crimes he participated in along with the names of other participants. He prepared the list after he decided to cooperate with the government. The list was introduced into evidence not by the government, but rather by petitioner's counsel, Vol. III, September 9, 1985, p. 17, and was used on cross-examination to bring out that Rivera had omitted to set forth a fair amount of his criminal activity on the twenty-eight item list. Petitioner claims the government altered item 22 of the list after the list was introduced but before it went to the jury. In support, he points to what he says is the same list used at a different, earlier trial. Item 22 therein reads, "Fire of Pharmacy Gilberto LaTorre Cano Carlos Georgie." In contrast, item 22 of the list which went to the jury at petitioner's trial had "Lic. Pedro Gonzalez" (petitioner) added to it.
 
 
 60
 The claim of mid-trial alteration is refuted by the testimony. On redirect by the government, Rivera was asked to verify that petitioner's name appeared twice on exhibit E. He was then asked what petitioner was paid for his part in the two incidents. Rivera's response was that he did not know what petitioner had been paid for the pharmacy fire because Rivera was not part of the Latorre organization at that time, and he could not recall what petitioner had been paid for Caribbean International. It is clear, then, from Rivera's response, that the two times petitioner's name appeared on exhibit E were in connection with the pharmacy fire and the Caribbean International fire. Exhibit E was not altered at trial.
 
 
 61
 Even if at some time prior to trial exhibit E did not have petitioner listed under item 22, petitioner has not shown fabricated evidence. Rivera was questioned by the FBI over an extended period. He recounted more details as the interviews progressed, which may explain whatever variations exist.
 
 
 62
 E. Other.
 
 
 63
 Petitioner contends the district court should have made specific findings in response to petitioner's numerous objections to the magistrate's report.
 
 
 64
 We have exhaustively reviewed the record, explaining our reasoning at length, and have concluded that the § 2255 petition was properly dismissed on its face without an evidentiary hearing. Any shortfall in the magistrate's or district court's opinions is immaterial at this point.
 
 
 65
 Affirmed.
 
 
 
 [1]
 It may be that petitioner believes he could impeach Rivera with exhibit 79. Rivera testified that in October 1980, Jose Luis Latorre asked Rivera to prepare a false invoice showing that Caribbean International had sold merchandise to Farmacia Magnolia. Rivera complied, predating the invoice. Vol. III, September 9, 1985, pp. 34-35. Conceivably, then, were exhibit 79, which lists the Caribbean International invoice at the bottom, dated prior to October 1980, petitioner would argue inconsistency or impossibility. The argument would not be compelling. Rivera may have been mistaken as to the date of preparing the false invoice, or exhibit 79 may have been commenced and dated on one date and then added to as additional invoices were produced
 
 
 [2]
 Petitioner has accused the government of misrepresenting that the case file was in a federal records storage center. It later turned out, however, that the file was not there. This allegation of misrepresentation did not call for an evidentiary hearing. The government initially might have logically assumed that the record and exhibits were in storage. That a normal assumption later proved to be erroneous does not show misrepresentation
 
 
 [3]
 Indeed, petitioner has included as exhibit XXXII to his § 2255 petition a letter dated October 21, 1981 from the adjuster to Santiago warning Santiago that if he failed to show up on October 21, 1981 for examination, insurance coverage would be refused. This would appear to be a copy of exhibit 20, the letter underlying count 2 of the indictment
 
 
 [4]
 Petitioner recounts a detail which was not presented at trial. He says that Machuca sold the goods Boyle Midway had delivered and kept the proceeds ($6,398.49) for himself. Evidence of the same genre, however, was before the jury. Rivera (the owner of R & S and hence the one to whom any proceeds should have been accounted) testified that Machuca had been stealing from Rivera and R & S. Vol. III, September 9, 1985, pp. 102-03